## BEFORE THE UNITED STATES
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

In re: Cymbalta Products Liability Litigation

MDL No. 2576

Oral Argument Requested

### RESPONSE TO PLAINTIFFS' MOTION PURSUANT TO 28 U.S.C. § 1407 TO TRANSFER RELATED ACTIONS FOR COORDINATED PRETRIAL PROCEEDINGS

The Plaintiffs' proposal to create an MDL to address "discontinuation" adverse events arising from Eli Lilly and Company's medicine Cymbalta® (duloxetine) implicates many of the concerns the Panel has expressed when contemplating the unintentional consequences of creating a centralized proceeding that would neither result in "convenience" for the parties and witnesses nor "promote the just and efficient conduct" of the lawsuits.

First, centralization here would violate this Panel's bedrock guidance that centralization is not appropriate where individual fact issues predominate over common factual questions. There are no disputed "common" questions that would justify an MDL: here there is no dispute about the risk that Cymbalta, like every other antidepressant in its class, can lead to certain side effects upon the discontinuation of the medicine — a risk that was well known at the launch of the medicine a decade ago and specified clearly in the labeling from the beginning.

Rather than presenting a set of core common questions, to date, this litigation has been dominated by individual issues, as best evidenced by the handful of individual lawsuits that the same firm which seeks centralization here ("Movant's Counsel") has prosecuted over the last 18 months. Because of the well-recognized risk of discontinuation side effects with antidepressants, Plaintiffs, to proceed on their claims, face the formidable task of demonstrating that their physicians were unaware of this risk. For this reason, two district courts handling these actions had sensibly put in place a scheduling order to bring this central issue to the fore by

requiring the early deposition of the prescribing physician and prompt dispositive briefing thereafter.  In the first, the plaintiff's physician confirmed that he was well aware of Cymbalta's potential to cause such side effects when discontinuing the medicine, and the Court therefore granted summary judgment for Lilly.  *See Carnes v. Eli Lilly and Co.,* 2013 WL 6622915 (D.S.C. Dec. 16, 2013).  In the second, the plaintiff's medical provider offered similar testimony about her knowledge, and Lilly's summary judgment motion is pending.  *See McDowell*, No. 13-cv-03786, ECF No. 17 (S.D.N.Y.).  Allowing a mechanism whereby a large number of cases can be filed and shielded from the prompt deposition of the relevant prescribing physicians would only serve to prolong, not expedite, the resolution of the litigation.  *See In re American-Manufactured Drywall Prods. Liab. Litig.*, 716 F. Supp. 1367, 1368 (J.P.M.L. 2010) ("The proponents of centralization have not convinced us that any efficiencies from centralization would outweigh the multiple individualized issues, including ones of liability and causation, that these actions appear to present.").

Second, this litigation does not present the unique coordination challenges for which MDL centralization is reserved.  The proposed MDL is comprised of a small number of actions, the vast majority of which were filed in the days immediately prior to Plaintiffs' centralization motion (presumably to ward off the Panel's prior admonitions refusing to centralize small numbers of actions).  For the past eighteen months, Movants' Counsel and national counsel for Lilly have cooperatively and successfully coordinated discovery and dispositive motions practice across the initial individual cases filed across five federal judicial districts.  Indeed, in the individual lawsuits that the Plaintiffs' lead firm has prosecuted, Lilly has produced over 1.8 million pages of documents reflecting the key science, testing, and labeling documents for Cymbalta, a production that Lilly has voluntarily made applicable to all of the

pending individual cases. Plaintiffs' counsel has also taken three Rule 30(b)(6) depositions of Lilly witnesses concerning Cymbalta. By agreement, those depositions were noticed for all of the pending cases. Given the nearly complete overlap in counsel across the newly-filed cases and virtually identical discovery sought against Lilly, there is no reason that the parties may not proceed with the voluntary cooperation that this Panel has cited as a desirable alternative to MDL centralization.

In short, there is little to be gained from MDL centralization but delaying the ultimate resolution of these cases and the warehousing of cases that on their own merits would not warrant prosecution. The MDL procedures should not be utilized to create a "Field of Dreams" that attracts a swath of meritless claims that can be shielded from individualized discovery under the Federal Rules.

While Lilly submits that the Panel should therefore decline to centralize these cases under Section 1407, if the panel does decide to centralize these actions, Lilly respectfully submits that the actions should be centralized in a court in the Eastern United States more convenient to Lilly and its employee witnesses, its defense counsel in Washington DC, and Movant's Counsel in Philadelphia.

## I.     BACKGROUND

### A.     Overview of Cymbalta and Discontinuation Warnings

Cymbalta is an FDA-approved prescription medicine manufactured by Lilly to treat severe depression, anxiety, and pain disorders. Plaintiffs in the subject actions have alleged that Lilly failed to warn adequately of possible side effects related to discontinuing Cymbalta treatment. These effects are referred to as "discontinuation-emergent adverse events."

In litigating failure-to-warn products liability cases, the "learned intermediary doctrine" applies in the vast majority of jurisdictions, meaning that the core issue is whether a

plaintiff's prescribing physician, as the "learned intermediary" between the pharmaceutical manufacturer and the patient, possessed independent knowledge of the risk at issue or would have changed his or her prescribing decision had the medicine's warning materials been different.  Where a prescribing physician would not have changed his or her decision to prescribe a medicine had the warning been different, or where a prescribing physician has independent knowledge of the symptoms alleged, there is no proximate causation between the allegedly inadequate warning and the plaintiff's injuries, so the claims fail.

In this case, from the moment that FDA first approved Cymbalta in 2004, Cymbalta's FDA-approved label has included a detailed, three-paragraph warning on the risk of discontinuation symptoms that has remained largely unchanged in the ensuing decade.  The label by 2008 read as follows:

5 WARNINGS AND PRECAUTIONS

. . . .

5.6 Discontinuation of Treatment with Cymbalta

Discontinuation symptoms have been systematically evaluated in patients taking duloxetine. Following abrupt or tapered discontinuation in placebo-controlled clinical trials, the following symptoms occurred at a rate greater than or equal to 1% and at a significantly higher rate in duloxetine-treated patients compared to those discontinuing from placebo: dizziness, nausea, headache, fatigue, paresthesia, vomiting, irritability, nightmares, insomnia, diarrhea, anxiety, hyperhidrosis and vertigo.

During marketing of other SSRIs and SNRIs (serotonin and norepinephrine reuptake inhibitors), there have been spontaneous reports of adverse events occurring upon discontinuation of these drugs, particularly when abrupt, including the following: dysphoric mood, irritability, agitation, dizziness, sensory disturbances (e.g., paresthesias such as electric shock sensations), anxiety, confusion, headache, lethargy, emotional lability, insomnia, hypomania, tinnitus, and seizures. Although these events are generally self-limiting, some have been reported to be severe.

> Patients should be monitored for these symptoms when
> discontinuing treatment with Cymbalta. A gradual reduction in the
> dose rather than abrupt cessation is recommended whenever
> possible. If intolerable symptoms occur following a decrease in the
> dose or upon discontinuation of treatment, then resuming the
> previously prescribed dose may be considered. Subsequently, the
> physician may continue decreasing the dose but at a more gradual
> rate [see Dosage and Administration (2.4)].

Cymbalta Physician Packet Insert (June 2008).  This warning lists more than a dozen symptoms

that occurred following discontinuation in clinical trials "at a rate greater than or equal to 1% and

at a significantly higher rate in [Cymbalta]-treated patients compared to those discontinuing from

placebo."   The label also warns of the possibility of "severe" side effects upon the

discontinuation of Cymbalta, and it explicitly instructs physicians to taper patients off Cymbalta

and to closely monitor patients for those symptoms when discontinuing the medicine.[1]

Even apart from the warning on Cymbalta's label, the risk of such symptoms is

commonly understood in the medical community.  The American Psychiatry Association's

Practice Guidelines for the Treatment of Patients With Major Depressive Disorder, for instance,

cautions that "abrupt discontinuation of SNRIs [Serotonin-Norepinephrine Reuptake Inhibitors]

should be avoided wherever possible," because discontinuation symptoms may occur.  *See*

http://psychiatryonline.org/data/Books/prac/PG_Depression3rdEd.pdf (last visited September 8,

2014), at 20, 40.   Indeed, such information is widely available on virtually all medical

information web resources.  *See, e.g.,* WebMD, Antidepressant Withdrawal, *available at*

http://www.webmd.com/depression/guide/withdrawal-from-antidepressants    ("Antidepressant

withdrawal, more correctly called antidepressant discontinuation syndrome, refers to a unique set

---

[1] All of the relevant versions of Cymbalta's label contain this three-paragraph warning and are
available                              on                              FDA's                              website:
http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm?fuseaction=Search.Overview&
DrugName=CYMBALTA (last visited September 8, 2014).  *See also* Plaintiffs' Motion at 4-5.

of symptoms that can develop after you stop taking an antidepressant.") (last visited September 8, 2014); Mayo Clinic (Daniel K. Hall-Flavin, M.D.), Antidepressant Withdrawal FAQ, *available at* http://www.mayoclinic.org/diseases-conditions/depression/expert-answers/antidepressant-withdrawal/faq-20058133 ("Antidepressant withdrawal is possible if you abruptly stop taking an antidepressant, particularly if you've been taking it longer than six weeks. Symptoms of antidepressant withdrawal are sometimes called antidepressant discontinuation syndrome") (last visited September 8, 2014).[2]

Notwithstanding this extensive public and medical knowledge of these well-characterized risks with such medicines, the core allegation in Plaintiffs' complaints is that Lilly's warning to physicians is somehow misleading because it provides a list of the specific discontinuation symptoms that were observed in clinical trials "at a rate greater than or equal to 1%." To be clear, a higher threshold inclusion number would have meant that *fewer* symptoms were warned of on the label. In clinical trials, some of the individual listed symptoms occurred at rates of between 1% and 2%, or between 2% and 5%, and above, so Lilly's Cymbalta warning would have been less informative had Lilly used a higher inclusion threshold. In an argument yet to be ratified by a single prescribing medical professional in the existing actions, Plaintiffs contend that their physicians must have been misled by Lilly's warning into thinking that *only*

---

[2]   Even this Panel confronted this issue over a decade ago, when it created MDL No. 1574 relating to such discontinuation side effects for the antidepressant Paxil® (paroxetine). *See* 296 F. Supp. 2d 1374 (J.P.M.L. 2003). Of special note is the fact that the Paxil labeling principally at issue in MDL No. 1574, which this panel created in 2003, was a version that **pre-dated** FDA's decision to impose "class labeling" for discontinuation side effects for all similar antidepressants. In other words, the discontinuation warning that Cymbalta had from the moment it launched in 2004 included the extensive warning language that FDA adopted for the entire class **after** the events that precipitated the Paxil discontinuation litigation in the first place.

1% of patients who abruptly discontinue Cymbalta (which itself is contrary to the label's instruction to taper any discontinuation) would suffer these types of side effects.

**B.      First Group of Cymbalta Discontinuation Cases (2012-2013)**

The first Cymbalta action alleging discontinuation side effects against Lilly was a putative class action filed in October 2012.  (The motion for class certification in that case, *Saavedra v. Eli Lilly and Company*, No. 12-cv-9366 (C.D. Cal.), is currently pending.)  That was followed by five individual-plaintiff actions filed between March and June 2013.  That set of cases included actions filed in the District of South Carolina (*Carnes*, dismissed December 16, 2013, upon Lilly's motion for summary judgment), the Central District of California (*Carter, Herrera*, and *Hexum*), the District of Arizona (*Seagroves*), the Southern District of New York (*McDowell*), and a case filed in the Eastern District of Pennsylvania (*Lister*) that Plaintiffs later voluntarily dismissed.  Lilly has been the sole defendant in each of these cases.

The complaints contain nearly identical factual allegations and claims, alleging at bottom that Lilly did not adequately warn of the potential risks upon discontinuing Cymbalta treatment.  The legal theories are also virtually identical across all the filed actions, with slight variations based on state law and depending on whether the patient's spouse is a named plaintiff.

Discovery has proceeded in each of these cases, and some have already reached the dispositive motion stage.  The *Carnes* court granted summary judgment to Lilly, finding that the plaintiff had not proven proximate causation.  Another motion for summary judgment is under submission in *McDowell*, with argument scheduled for September 17, 2014.

**C.      The Pre-Petition Wave of Cases (August 2014)**

In August 2014, the same counsel who had filed the first set of Cymbalta cases filed a burst of new actions against Lilly between August 8 and August 13 — a total of 21 new

cases.[3]  The Plaintiffs chose to file these new suits, all of which are virtually identical in content and make the same allegations as the first set of lawsuits filed last year, in the following jurisdictions: four were filed in the Central District of California (*Barrett, Caporale, Hollowell, O'Shea*), two in the Eastern District of California (*Cheshier, Woodruff*), two in the Eastern District of North Carolina (*Whitworth, Williams*), one in the Southern District of California (*Wheeler*), and one each in the District of Colorado (*Cheney*), Middle District of Florida (*Bhoge*), Southern District of Florida (*Gollin*), Northern District of Georgia (*Couch*), Western District of Louisiana (*Fairbanks*), District of Maryland (*Boling*), District of Minnesota (*McCabe*), Northern District of Ohio (*Mayes*), District of Oregon (*Loux*), Western District of Pennsylvania (*Rossero*), Eastern District of Washington (*Wagner*), and Western District of Wisconsin (*Streeter*).  Without bothering to serve any of these lawsuits on Lilly (indeed, to this date Lilly has still not been served in any of these new lawsuits), Movant's Counsel immediately filed their centralization motion, which Lilly learned about not through service — the motion had simply been dropped in the mail — but from a media outlet that had been provided the Motion the day it was filed.

Three additional actions have since been filed and noticed as related to this proceeding (*Kelly* — filed August 26, 2014 in the Northern District of California, and *Schaffer* and *Scherer* — filed August 27, 2014 in the Eastern District of Missouri).  All of these actions largely follow the first group of cases in the substance of their factual allegations and legal argument.

---

[3] Although the reason for this transition is not clear, it appears that Movant's Counsel — the same firm that has prosecuted a handful of individual similar cases over the last eighteen months — has decided to shift legal strategy away from the burdens of litigating the individual lawsuits of questionable merit they have brought to date.

## II.    ARGUMENT

The Plaintiffs' centralization motion should be denied.  While Plaintiffs have apparently attempted to lodge a sufficient number of cases to overcome the Panel's prior skepticism when too few cases are sought to be centralized, the number nevertheless remains more than manageable and hardly reflects a volume where centralization is the only option. Indeed, Lilly is committed to devoting the resources to promptly work up each of the cases in the respective districts, and at the same time work cooperatively to provide appropriate discovery from Lilly to be utilized across all the cases.

It is the case-specific issues, however, that will dominate this litigation: each individual plaintiff's use of Cymbalta, and each physician's decision to prescribe it.  These individual factual questions predominate over common questions, and any common discovery can be conducted (and already has been conducted) through voluntary cooperation rather than a centralized MDL.  Lilly therefore opposes centralization because it will not enhance convenience of the parties or counsel (just the opposite) and it will delay, not advance, the resolution of the individual actions.

In the alternative, Lilly submits that the Central District of California — 2,000 miles from Lilly's headquarters and nearly 3,000 miles from Lilly's counsel in Washington and Plaintiffs' counsel in Philadelphia — is decidedly inconvenient.  Lilly therefore recommends that any proceeding be centralized in the Eastern United States in one of the districts set forth below.

### A.    The Panel Should Not Centralize These Actions.

#### 1.    Centralization is inappropriate where complicated individual questions of fact predominate over common questions, and where discovery will necessarily focus on individualized actions.

Where individual factual questions predominate over the common factual issues alleged by Plaintiffs, MDL centralization is not warranted.  *See, e.g., In re Electrolux Dryer*

9

*Prods. Liab. Litig.*, 978 F. Supp. 2d 1376, 1377 (J.P.M.L. 2013) ("On the present record, it appears that individualized facts . . . will predominate over the common factual issues alleged by plaintiffs."); *In re Ocala Funding, LLC, Commercial Litig.*, 867 F. Supp. 2d 1332 (J.P.M.L. 2012) ("Individualized issues concerning each party's rights and duties under separate sets of contracts, and with different contracting parties, appear to predominate among the actions."); *In re American-Manufactured Drywall Prods. Liab. Litig.*, 716 F. Supp. 2d 1367, 1368 (J.P.M.L. 2010) ("The proponents of centralization have not convinced us that any efficiencies from centralization would outweigh the multiple individualized issues, including ones of liability and causation, that these actions appear to present.").

In this case, Lilly does not dispute that the subject actions share some common issues. All of the plaintiffs allege that they were prescribed Cymbalta, that they discontinued taking Cymbalta, and that upon discontinuation they suffered symptoms that Lilly warned of on Cymbalta's label. But the common issues, such as the fact that Lilly studied and warned of the risks of discontinuation with Cymbalta, are not in material dispute and require little discovery that has not already been conducted in the pending Cymbalta cases that are the farthest along in the discovery process.

It is the individual issues, by contrast, and the facts particular to each case that drive this litigation. As the District Court for the District of South Carolina wrote in granting Lilly's motion for summary judgment as to one of the Cymbalta plaintiffs, each plaintiff must establish that Lilly's purportedly inadequate warning was the "proximate cause of the plaintiff's injury," and that a different warning "would have changed the treating physician's decision to prescribe the product for the plaintiff." *Carnes*, 2013 WL 6622915, *3 (D.S.C. Dec. 16, 2013) (internal quotation marks and citations omitted). *See also, e.g., Alston v. Caraco*

*Pharmaceutical, Inc.*, 670 F. Supp. 2d 279 (S.D.N.Y. 2009) (plaintiff must show that "a failure to warn . . . was the proximate cause of his injuries").  These individualized issues of proximate causation require extensive inquiry into the actions and knowledge of each plaintiff's prescribing physician(s) and the individual plaintiffs themselves.  Among other questions, a court must inquire as to which patient-specific factors the treating physician considered in deciding to prescribe Cymbalta, whether the physician read the discontinuation warning on Cymbalta's label or otherwise had independent knowledge of the risk of such symptoms when stopping a medicine like Cymbalta, whether the physician somehow did not understand the discontinuation warning, and whether the warning influenced the physician's decision to prescribe.  Given the central importance of these individualized and fact-driven questions, the individual issues predominate over the common questions of fact alleged in the subject litigations.

Plaintiffs hope to present the opposite impression, suggesting that common issues of fact will drive this litigation.  For instance, Plaintiffs write that one of the common questions is "Cymbalta's capacity to cause withdrawal injuries."  *See* Plaintiffs' Motion at 1.  But Cymbalta's *capacity* to cause discontinuation symptoms is not a disputed issue.  Indeed, Cymbalta's labeling explicitly warns that Cymbalta (like every similar antidepressant) can cause such discontinuation symptoms, and recommends a tapering of the medicine to reduce the chance of these symptoms occurring.  This litigation, unlike many pharmaceutical products liability cases the panel has previously confronted, thus does not present questions of *general causation* that are uniquely suitable for decision by an MDL judge.  Instead, Lilly's alleged liability hinges primarily on individualized, fact-specific determinations of proximate causation, and whether the purportedly inadequate warning caused the injuries complained of by each specific plaintiff.  It is the individual transferor courts and not an MDL court, therefore, that will

have to confront those key issues, so there is little efficiency to be gained from transfer to an MDL. *See In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig.*, 959 F. Supp. 2d 1375, 1376 (J.P.M.L. 2013) ("As always in this type of litigation, a highly individualized inquiry is necessary to determine whether any particular plaintiff developed type 2 diabetes as a result of taking Lipitor."); *In re Abbott Labs., Inc. Similac Prods. Liab. Litig.*, 763 F. Supp. 2d 1376 (J.P.M.L. 2011) (concluding that "individual facts contained in these actions will predominate over any alleged common fact questions").

> **2.      Centralization is not necessary because informal cooperation between national counsel for the defendant and national counsel for Plaintiffs will realize the same efficiencies as an MDL.**

Any coordination that *would* aid efficient resolution of the subject actions can be achieved without transfer to an MDL.  As this Panel has indicated, voluntary cooperation is a preferable "[a]lternative[] to transfer . . . that may minimize whatever possibilities could arise of duplicative discovery."  *In re Table Saw Prods. Liab. Litig.*, 641 F. Supp. 2d 1384 (J.P.M.L. 2009).  *See also In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig.*, MDL No. 2559, 2014 WL 4049821 (J.P.M.L. Aug. 12, 2014) ("[I]nformal cooperation among the involved attorneys is both practicable and preferable to centralization.").  Voluntary cooperation is especially practicable where the actions "are filed by a single plaintiffs' counsel, and name the same defendant, which has national counsel coordinating its response to [the] litigation." *Mirena*, 2014 WL 4049821 at *1.  *See also In re Rite Aid Corp. Wage & Hour Empl. Practices Litig.*, 655 F. Supp. 2d 1376, 1377 (J.P.M.L. 2009) (voluntary coordination is "particularly appropriate" where many or all plaintiffs share counsel); *American-Manufactured Drywall*, 716 F. Supp. 2d at 1368 (shared counsel "facilitate cooperation among the parties and coordination of the actions").

Here, the plaintiffs in nearly all of the proposed MDL actions are represented by the same counsel.  *See* Schedule of Actions, ECF No. 1-2 at 5-6.  The same counsel, led by the Pennsylvania firm of Pogust Braslow & Millrood LLC, have represented plaintiffs in discontinuation-related litigation against Lilly concerning Cymbalta in the six cases filed prior to August 2014.  *See In re Boehringer Ingelheim Pharm., Inc. Fair Labor Standards Litig.*, 763 F. Supp. 2d 1377, 1378 (J.P.M.L. 2011) ("[T]he presence of common counsel for moving plaintiffs in actions filed shortly before the motion for centralization might also weigh against centralization.").[4]  And in the nearly 18 months since the first discontinuation-related litigation concerning Cymbalta was filed, Lilly's undersigned counsel and plaintiffs' counsel have worked cooperatively throughout all stages of discovery.  Plaintiffs have offered no reason why that cooperation cannot be expected to continue in the other, recently-filed actions.

Moreover, the common issues in the subject actions are likely to require the same discovery from Lilly.  Lilly has already produced 1.8 million pages of documents responsive to the plaintiffs' requests in three of the subject actions, including materials from the Investigational New Drug Application and New Drug Application files for Cymbalta, in response to 167 Requests for Production propounded by the plaintiffs.  Lilly has also presented company representatives for deposition pursuant to Rule 30(b)(6) in the areas of drug safety for Cymbalta, Cymbalta's labeling, and sales training for Cymbalta.  Because the newly-filed subject actions contain no substantively new allegations or novel theories, it is unlikely that much if any additional discovery will be required from Lilly.  And as to the documents already produced,

---

[4] A notice of related actions has been filed by different counsel in three additional cases.  It is not clear from the face of the complaints whether these additional counsel are coordinating with Pogust Braslow, but the text of the complaints are virtually identical and the coordinated timing of their recent spate of filings suggests closely-affiliated coordination.

Lilly of course will not oppose use of those documents in any of the additional discontinuation-related cases in the same manner these are available in the pending cases.

Even setting aside this substantial overlap in discovery and the existing voluntary cooperation between counsel, which weighs against creation of an MDL, the sheer number of cases filed by Movants' Counsel does not justify consolidation. First, centralization should be denied where the same law firm attempts to manufacture an MDL by filing a series of duplicative lawsuits in different jurisdictions. *See In re CVS Caremark Corp. Wage and Hour Employment Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) (denying certification where the movants were "all represented by the same law firm," which began to litigate one action more than a year earlier, then filed others "immediately prior to filing this Section 1407 motion."). Second, and more fundamentally, Movants' Counsel have been prosecuting Cymbalta discontinuation litigation against Lilly for nearly two years, in the form of a half-dozen individual lawsuits and a putative class action that has not been certified. Plaintiffs' claims of "hundreds" of additional actions in the offing — Plaintiffs leave unsaid why those actions have yet to materialize — warrants a skeptical eye. *See In re Lipitor*, 959 F. Supp. 2d at 1376 (the Panel is "disinclined to take into account the mere possibility of future filings in our centralization calculus"); *see also In re CVS Caremark*, 684 F. Supp. 2d at 1379 ("[W]here a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it.").

**B.    If the Panel Determines That An MDL Is Warranted, The Actions Should Not Be Sent To The Central District Of California**

For the reasons set forth above, the Panel should deny Plaintiffs' motion for transfer.  If the panel nevertheless determines that the actions should be centralized, it should not transfer the actions to the Central District of California.[5]

The Panel considers the following key factors in selecting an appropriate transferee district:  accessibility of the transferee district for parties, witnesses, and counsel; the respective MDL and overall caseload statistics for the proposed transferee district courts; and the location of the parties, witnesses, and documents.  *See, e.g., In re Mirena IUD Products Liab. Litig.*, 938 F. Supp. 2d 1355, 1358 (J.P.M.L. 2013); *In re Camp Lejeune, North Carolina Water Contamination Litigation*, 763 F. Supp. 2d 1381, 1382 (J.P.M.L. 2011); *In re Trasylol Prods. Liab. Litig.*, 545 F. Supp. 2d 1357, 1358 (J.P.M.L. 2008).  As explained at greater length below, application of these factors weighs in favor of transfer to a district on the East Coast with a judge experienced in a pharmaceutical products liability MDL.  Lilly proposes the Middle District of Florida, Northern District of Ohio, and the Northern District of Georgia as appropriate districts.

**1.    A court in the Eastern United States would be the most accessible and cost-effective for parties, witnesses, and counsel.**

Lilly is headquartered in Indianapolis, Indiana.  Lilly's national counsel for discontinuation-related Cymbalta litigation is Covington & Burling LLP, in Washington, D.C.  And lead national counsel for individual Plaintiffs has been the firm of Pogust Braslow &

---

[5] Because the *McDowell* case has been fully briefed on summary judgment, with argument to occur on September 17, 2014, it should not be included in any transfer.  *See In re L.E. Lay & Co. Antitrust Litig.*, 391 F. Supp. 1054, 1056 (J.P.M.L. 1975) (noting the Panel's reluctance "to transfer any action that has an important motion under submission with a court"); *In re Res. Exploration, Inc. Sec. Litig.*, 483 F. Supp. 817, 822 (J.P.M.L. 1980) (deferring decision on transfer "because of the pendency of the defendants' motion for summary judgment, which is fully submitted to the potential transferor judge").

Millrood, LLC, of Conshohocken, Pennsylvania, outside of Philadelphia.  The Los Angeles, California firm of Baum Hedlund, Aristei & Goldman, P.C. additionally appears to have joined Plaintiffs' efforts, appearing as counsel in many of the newly-filed individual actions.[6]

Because Lilly is the only defendant in the subject actions, and because the majority of the counsel involved are located on the East Coast, the parties will be best served by transfer to a court in the Eastern United States.  If these actions are centralized in California, there will be considerable inconvenience and inefficiency for Lilly and its counsel.  Presumably, any MDL judge will hold regular case management conferences for the respective lead counsel, in addition to hearings on motions, discovery matters, and related proceedings.  Traveling nearly 3,000 miles to California for such proceedings is not only expensive, but because of the travel time from the East Coast typically requires 2-3 days of lawyer time.  Without diminishing the Plaintiffs' claimed injuries, they are for the most part alleged to be transient in nature and without physical impairment or disability.[7]  The corresponding value of such cases could quickly be outstripped merely by the costs of repeated cross-country travel.  Such a result would be neither just nor efficient.

Finally, while the plaintiff-specific witnesses will be all over the country, the Lilly-related witnesses and documents will be located in the Eastern United States.  Indeed, in the pending Cymbalta cases in the Central District of California, *Carter, Herrera,* and *Hexum,* plaintiffs' counsel have taken three 30(b)(6) depositions of Lilly witnesses in Indianapolis.

---

[6] Although counsel of record in the *Saavedra* class action, Baum Hedlund has had no role in any of the pending individual suits until immediately prior to the filing of Plaintiffs' centralization motion. Pogust Braslow has had primary responsibility for the prosecution of those cases.

[7] The plaintiff in *McDowell*, for instance, testified that he suffers no continuing symptoms today and that most of his symptoms stopped within weeks and/or months of discontinuing Cymbalta. *See McDowell v. Eli Lilly and Co.*, No. 13-cv-03786, ECF. No. 19 at 8 (July 7, 2014).

(Those depositions were also cross-noticed by agreement for the other two then-pending cases, *Seagroves* (D. Ariz.) and *McDowell* (S.D.N.Y.).)

      2.      **Apart from Plaintiffs' attorneys' choice to file cases there, California has no particular connection to this litigation.**

As set forth above, California has no particular connection to the Cymbalta discontinuation suits that have been filed.  Lilly is not located in California, nor is its counsel. And the firm that has thus far conducted this litigation for Plaintiffs, the Pogust Braslow firm, is also located on the East Coast.  While it is true that the plurality of subject actions are pending in California, most of those cases were filed in the span of a few days immediately prior to Plaintiffs' transfer motion.  And in any case, the fact that Plaintiffs have chosen to file a comparatively larger number of cases in California than in other jurisdictions has no bearing on where to transfer an MDL that purports to be national in scope.  *See In re Darvocet, Darvon & Propoxyphene Prods. Liab. Litig.*, 780 F. Supp. 2d 1379, 1381 (J.P.M.L. 2011) ("Because potential plaintiffs and putative class members will reside in every corner of the country and defendants are located in several states, the location of the currently filed cases is not a particularly significant factor in our decision.").

Nor can it be said that the pending California cases — *Carter, Herrera, Hexum*, and *Saavedra* — have yet proceeded to a posture where the two judges Plaintiffs propose would have had an opportunity to gain meaningful substantive exposure on the merits of these suits.  To the contrary, due to the posture of the *Carter*, *Herrera*, and *Hexum* cases, Chief Judge King has addressed only initial scheduling and has not had occasion to make any substantive merits rulings or address any discovery issues in the three cases consolidated before him.  And Judge Wilson has been involved only in the class action, not any individual injury cases, and his

involvement has focused nearly exclusively on the issues of class certification — issues that by definition will not be implicated in the individual product liability suits.

### 3.    This Panel should select a transferee court with caseload statistics more favorable than the Central District of California.

The Central District of California has no fewer than 18 pending MDLs.[8]  Only two districts in the country — New Jersey and the Southern District of New York — have more. This fact alone makes the Central District of California an undesirable transferee district.  *See, e.g., Trasylol*, 545 F. Supp. 2d at 1358 (identifying the district's "relatively low number of MDL dockets" favorably in selecting a transferee district); *see also In re Camp Lejeune*, 763 F. Supp. 2d at 1382 (selecting transferee district that "does not have many MDLs on its docket").  In contrast to the Central District of California, the Middle District of Florida, Northern District of Ohio, and Northern District of Georgia, which Lilly proposes as alternate possibilities, have four, seven, and nine pending MDLs, respectively.

### 4.    A judge with experience in pharmaceutical products liability MDL actions would be best positioned to oversee this litigation.

In assigning MDLs to transferee courts, this Panel also looks to judges with specialized experience in the type of litigation and subject matter in question.  *See In re Pradaxa Products Liability Litigation*, 883 F. Supp. 2d 1355, 1356 (J.P.M.L. 2012) (selecting "an experienced MDL judge" who had previously "deftly presided over . . . another large pharmaceutical products liability litigation"); *see also In re Mirena*, 938 F. Supp. 2d at 1358 (J.P.M.L. 2013) (transferring to an "experienced transferee judge"); *In re Plavix Marketing, Sales Practices and Products Liab. Litig.*, 923 F. Supp. 2d 1376, 1380 (J.P.M.L. 2013)

---

[8]    MDL Statistics Report, Pending MDLs (8/15/14), http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-August-15-2014.pdf (last visited September 8, 2014).

(transferring to a judge who had previously "served as a transferee judge in three MDLs"). Assigning an MDL to a judge with such experience is particularly appropriate where, as here, the subject actions concern the products of a niche and highly-specialized industry.

In the Middle District of Florida, where the *Bhoge* action is pending, Lilly has identified Judge James S. Moody as a possible MDL judge. Since 2004, Judge Moody has presided over *In re Accutane Prods. Liab. Litig.*, MDL No. 1626, a complex pharmaceutical products liability MDL which currently has only three actions pending, down from a historical total of 122. In the Northern District of Ohio, where the *Mayes* action is pending, Lilly has identified Judge James S. Gwin as a possible MDL judge. Judge Gwin does not currently preside over any MDLs, and recently presided over *In re Meridia Prods. Liab. Litig.*, MDL No. 1481, another complex pharmaceutical products liability MDL. Finally, in the Northern District of Georgia, where the *Couch* action is pending, Lilly submits that Judge Timothy C. Batten, to whom *Couch* is currently assigned, could ably handle a Cymbalta MDL. Judge Batten currently presides over MDL No. 2089, *In re Delta/AirTran Baggage Fee Antitrust Litig.*, which has no pending actions.

All three locations present no transportation concerns. Judge Moody sits in Tampa; Judge Gwin sits in Cleveland; and Judge Batten sits in Atlanta. All three cities have major airports with direct flights to and from Indianapolis and the cities where the lead plaintiff and defense counsel reside.

## III.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for centralization and transfer to the Central District of California should be denied in its entirety. In the alternative, the Panel should centralize the subject actions in either the Middle District of Florida, the Northern District of Ohio, or the Northern District of Georgia.

Respectfully submitted,


/s/ Michael X. Imbroscio
Michael X. Imbroscio
COVINGTON & BURLING LLP
1201 Pennsylvania Avenue N.W.
Washington, DC 20004
Tel: (202) 662-6000
Fax: (202) 778-6000
mimbroscio@cov.com

*Counsel for Defendant Eli Lilly and Company*