```
                 UNITED STATES JUDICIAL PANEL
                              ON
                    MULTIDISTRICT LITIGATION


IN RE:                          )        No. 2576
                                )
CYMBALTA (DULOXETINE)           )
PRODUCTS LIABILITY              )        Charleston, SC
LITIGATION                      )        December 4, 2014
```

TRANSCRIPT OF PROCEEDINGS
BEFORE U.S PANEL ON MULTIDISTRICT LITIGATION

        Hon. Sara S. Vance, Chair
        United States District Court
        Eastern District of Louisiana

        Hon. Marjorie O. Rendell
        United States Court of Appeals
        Third Circuit

        Hon. Lewis A. Kaplan
        United States District Court
        Southern District of New York

        Hon. R. David Proctor
        United States District Court
        Northern District of Alabama

        Hon. Catherine D. Perry
        United States District Court
        Eastern District of Missouri

(Panel convened at the Charleston United States Courthouse, Charleston, South Carolina)

```
1    APPEARANCES:

2    For Thomas Seagroves, et al.:    Mr. Brent Wisner
                                      Baum Hedlund
3                                     Aristei & Goldman, P.C.
                                      12100 Wilshire Blvd.
4                                     Suite 950
                                      Los Angeles, CA 90025
5

6    For Eli Lilly & Company:         Mr. Michael Imbroscio
                                      Covington & Burling LLP
7                                     One City Center
                                      850 Tenth Street NW
8                                     Washington, DC 20001

9

10
     Official Court Reporter:         Amy Diaz
11                                    85 Broad Street
                                      Charleston, SC 29401
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

         JUDGE VANCE:  The next case is *In Re: Cymbalta Products Liability Litigation*.

         Mr. Wisner or Wisner?

         MR. WISNER:  It's Wisner.  Good morning.

         This Cymbalta litigation is growing very, very quickly.  Presently there are 45 cases filed in 30 different jurisdictions across the country.  And in those 45 cases, there are actually 60 different bundles of claims for different plaintiffs, married couples.  That is just the tip of the iceberg.  We presently, through the various attorneys that I've communicated with, we know that there are 1,800 cases that have been retained and are actively being investigated.

         In addition to those, there are over 4,000 outstanding fee agreements that we sent to clients.  So this is -- this is the beginning of a very, very large litigation.

         JUDGE VANCE:  Lilly takes the position that the common discovery has already taken place in the *Saavedra* action in which they've produced 1.8 million documents and conducted 30(b)(6) depositions, and that all you would have to do is export that discovery into these individual cases and that there is no more common discovery of Lilly that needs to be done.  What is your response to that?

         MR. WISNER:  Well, one important clarification, the *Saavedra* case is a class action, but there has actually been

AMY C. DIAZ, RPR, CRR OFFICIAL COURT REPORTER

no substantive discovery that has been conducted. That is not part of one of the actions that have been noticed for this consolidation. The *Saavedra* personal injury cases also report to Judge Wilson in the Central District, specifically the *Herrera Hexum* cases. There has been a significant amount of discovery conducted in that case, but it has been done on a very, very short runway and there is a significant amount of discovery that still needs to occur.

JUDGE VANCE: What kind of discovery?

MR. WISNER: Well, currently -- actually, as we are speaking right now, depositions are being taken, but those depositions are being taken without guidance or input. This is being done in a very aggressive discovery schedule Judge King set out in those initial case Scheduling Orders that he issued.

For example, Your Honor, I'm not even counsel of record in that case and I haven't had the luxury of sitting down and parsing through all of that information the way that we would do in an MDL context. This idea that he's purported that there is essentially no disputed common issues of fact, it's just materially false. They have, at every turn, taken a position that the label of the Cymbalta drug is, in fact, sufficient. And we have, through expert discovery, have tried to show that that is not in fact true. That common issue applies to every single case involving Cymbalta. We

1  believe that we have the right and the obligation to our
2  clients to do a thorough and full investigation of that
3  discovery.
4          JUDGE KAPLAN:  Can you explain to me briefly why it
5  is you say that the label is insufficient?
6          MR. WISNER:  Absolutely.  The label currently says
7  that the risk of withdrawal, suffering specific side effects
8  is greater than or equal to 1 percent.  We know based on all
9  these studies that the risk of withdrawal is actually at
10 least 45 percent, and our experts speculate and suspect that
11 it could be upwards of 70 percent.
12         JUDGE VANCE:  Isn't 1 percent, I mean, aren't those
13 the same thing?  45 percent is greater than 1 percent.
14         MR. WISNER:  Yes, but it also suggests that the
15 risk is minimal.  And this is important.  I'm out of time.
16 If I may respond?
17         JUDGE VANCE:  Yeah, please do.
18         MR. WISNER:  This is important because Cymbalta is
19 a uniquely dangerous drug that comes through withdrawal.  It
20 has one of the shortest half-lives that exists out there;
21 whereas Prozac, another Lilly product, has five or six days,
22 Cymbalta is 12 hours.  Without articulating or quantifying
23 that risk of withdrawal, doctors reasonably think this is --
24         JUDGE KAPLAN:  I'm sorry.
25         JUDGE RENDELL:  Is this a matter of discovery of

1  fact or is this a battle of the experts?
2          MR. WISNER:  It's both.  One of the areas of
3  discovery that we are trying to get into -- you see, Lilly
4  actually pioneered the research on withdrawal.  They did that
5  when they were marketing Prozac in the nineties as a way to
6  position Prozac as being the superior product.
7          JUDGE KAPLAN:  Can I go back to your half-life
8  after you're finished with your answer?
9          MR. WISNER:  Sure.  There is also some problems
10 with the label, as well.
11         JUDGE KAPLAN:  Doesn't the half-life comment go
12 only to the question of how soon the withdrawal symptoms, if
13 they are going to be experienced, manifest themselves?
14         MR. WISNER:  Not entirely.  There is two components
15 to it.  There is also an issue talking about regulation.  But
16 the half-life component, that is true, that helps signify how
17 quickly an onset of withdrawal symptoms will be.
18         The second issue is also an area that has not been
19 fully discovered in the context of the litigation at this
20 point.
21         JUDGE KAPLAN:  But I asked you about the label.
22 I'm not sure I heard from you that the warning was inadequate
23 with respect to speed of onset.  And I don't see how it could
24 be inadequate because it didn't say anything at all.
25         MR. WISNER:  That's precisely the problem.  Failure

1  to warn. If the label is going to --

2  JUDGE KAPLAN: So in other words, a pharmaceutical
3  label has to say not only whatever is known about the
4  likelihood of the side effect, but in addition, has to warn
5  about how soon it will manifest, if the side effects manifest
6  at all. Is that what you are saying?

7  MR. WISNER: No. There is a significant amount
8  more. So there is a couple of issues. What we are alleging
9  is they have to allege the severity, the frequency and the
10  duration of the, more than likely in this case, side effect
11  of the drug. They didn't do any of that. The only
12  information it did provide was the very vague description of
13  greater than or equal to 1 percent, which literally means
14  between 1 and 100 percent, and that to us is fundamentally
15  misleading. When we show this information to doctors, they
16  gasp because this is something that is, without question,
17  something that they --

18  JUDGE KAPLAN: That's true about your doctors but
19  not the other side.

20  MR. WISNER: Fair enough.

21  JUDGE VANCE: I think we have our argument. Thank
22  you.

23  MR. WISNER: One last point. I'm way over time,
24  Judge.

25  JUDGE VANCE: You are over time.

1  MR. WISNER: Thank you, Your Honor.

2  MR. IMBROSCIO: May it please the Courts? Michael
3  Imbroscio from Covington & Burling on behalf of Lilly.

4  This is a tough case. We had a number of cases on
5  file and we have the promise that you heard this morning of
6  many, many more. But I think this is also one of those
7  cases, Your Honors, that what this Panel does will affect the
8  size of the litigation. As soon as this Panel creates an
9  MDL, there will be hundreds or thousands of cases because the
10  enlargement cost of dumping these cases ends in zero.

11  What these cases are about essentially are
12  individual facts of a particular plaintiff. And more
13  importantly, the particular plaintiff's doctor. This is a
14  very well-understood side effect that can occur with all
15  antidepressants, including Cymbalta. We have a label that's
16  very clear about it, in our view. And by the way, labels
17  that in one of the earlier cases were found adequate as a
18  matter of law.

19  JUDGE PROCTOR: Counsel, what steps have you taken
20  with plaintiffs' counsel in both constituent groups to
21  coordinate on common factual issues at this point?

22  MR. IMBROSCIO: Good question. The principal firm
23  we have worked with has been the Pogust Braslow firm. They
24  are the lawyers who have prosecuted every MDL that has come
25  so far. The Baum Hedlund firm out in California has been

involved in the class action. It looks like they are going to get involved in the individual cases, but we have produced all the documents to Mr. Pogust and with the understanding he's going to share it with all of his -- all of --

JUDGE HUVELLE: Are you going to work on deposition protocols so you don't have to have multiple depositions of your --

MR. IMBROSCIO: Absolutely. We would do that. I mean, we've set it up, this has occurred already, can be applied in all of the cases. We have no qualms with that. In fact, that makes good sense.

JUDGE RENDELL: If there are 6,000 potential claimants, there is going to come a tipping point; is there not?

MR. IMBROSCIO: There might be, Your Honor. I guess the question is are we really going to litigate individual cases? I don't think that's going to happen because if you look at what we've done already, there has been six cases that have been litigated. The first case in Philadelphia was dismissed immediately. The second case was actually pending when the motion was filed, was dismissed within days of the plaintiff's deposition. Couldn't pursue the case.

Two cases we've got to summary judgment. The *Carnes* case before Judge Currie in South Carolina, where she put in

          place, I think, a very reasonable plan:  Let's depose the
          doctor, let's depose the plaintiff, see what the doctor says.
          The doctor said, Of course I knew about this.  It's very
          understood in our general practice guidelines.  We know this.
          She granted summary judgment.

                   Judge Sweet, he did the same thing in the *McDowell*
          case, the same thing, the expedited schedule, depose the
          doctor, and in that case the nurse practitioner who said, Of
          course I understand these issues.  It's well understood.

                   JUDGE VANCE:  Assuming that if we did centralize
          this -- and I'm not saying we are -- but what do you think
          about Minnesota?

                   MR. IMBROSCIO:  Um, you know, it is in the middle
          of the country.  I don't know if we looked carefully at that
          issue.  I mean, what we really are concerned about is going
          back and forth to California.  We would like to be somewhere
          closer to the East Coast, somewhere closer to Lilly.  We have
          no position one way or the other in the District of
          Minnesota.  I think, you know, if there is someone in mind,
          you know, we'll defer to the Panel's judgment.

                   Again, we don't think it should be, but we would not
          oppose it.  As you know, our preference was not to be in
          California because it actually just costs a lot of money and
          takes a lot of time in these individual cases.  I don't want
          to minimize it, but -- and in fact, there are some transient

effects of the vast majority of people and the cost of litigating these individual cases doesn't make sense from our perspective.

JUDGE KAPLAN: Does Lilly formally concede the general causation issue, that is, that the drug is capable of causing the effects. Does it concede the propensity, that is, the percentage of cases which occurs? Does it concede all of those things?

MR. IMBROSCIO: Cymbalta, like every medicine, in some cases can cause an issue. As to the frequency, that is a more complicated issue. The plaintiffs rely on a publically peer review article, trial article, which looks at the first set of trials. When you look at the entire clinical trial set which we produced, the percentage of them aren't so clear. It clearly happens and it clearly happened in one of the placebos, no doubt about that. But I don't think it's anywhere near what the plaintiffs suggested and it's very patient specific.

JUDGE KAPLAN: So there is going to be discovery and expert testimony as to the frequency of the effects?

MR. IMBROSCIO: Well, the answer, Judge, it's largely going to be a battle of the experts, in a sense. The discovery, the clinical trial data, which is going to make this up, what does the clinical trial show, that has already already all been produced. I think there has been 30, 35

clinical trials involving the lawsuit with Cymbalta. That's been done. I expect they are going to want to take depositions of company employees perhaps. But again, it's really going to be what does the clinical trial say? What does the data say? That is what it is. It's going to be an expert battle.

JUDGE KAPLAN: Is that true also of onset and duration?

MR. IMBROSCIO: Yeah, I think that's right. The clinical trials track these issues. I think in the end the use of the medicine is very patient specific, it's case by case, trial by trial. Some of these medicines work well for people but not other people. Conversely, some of these medicines lead to these issues on some people but not other people. It's very case specific. And I think that drives our litigation.

JUDGE RENDELL: If we do centralize, should we centralize the data along with it or not?

MR. IMBROSCIO: That's a hard question. As Mr. Wisner said, there has been no real discovery. Judge Wilson sort of jumped right into -- which I think made sense -- he's got class certification pending, it's been pending for a while. You know, I would be loath to say --

JUDGE RENDELL: What is their cutoff? Two weeks, isn't it?

1     MR. IMBROSCIO: Those are the individual cases.
2 That's -- I actually -- we tend to agree those should not be
3 centralized. We have a trial date in those cases and we are
4 ready. Pretty much expert discovery we are doing this week
5 and next.
6     So those cases, no. The individual *Herrara* cases
7 no. It's a hard call. I guess I would want to defer to
8 Judge Wilson. He's ready to send his opinion out in class
9 certification. I'm not sure it makes total sense, but if he
10 hasn't started writing it yet, if he said to the plaintiffs
11 he doesn't want an MDL that involves Cymbalta, I would defer
12 to your Panel and consultation with Judge Wilson on that.
13     JUDGE VANCE: Thank you.
14     MR. WISNER: Your Honor, I reserved a minute for
15 rebuttal, but I clearly used that minute. If I could just
16 quickly respond to --
17     JUDGE VANCE: Sure.
18     MR. WISNER: I think counsel points out the crux of
19 the problem. Discovery has not been ordered. They have not
20 agreed to depositions to just occur one time. They have not
21 given us access to all the documents. That has not occurred.
22 They have fought us at every point and prevented that from
23 occurring. And this idea that litigating just 60 cases that
24 are currently there independently and voluntarily is not
25 going to happen. Unless we have a single judge who is

actually looking at the issues, this is going to spiral out of control quickly.

And I guess the last point is the *Saavedra* action, the class action, Judge Wilson indicated when he told us he did not want the MDL, he also planned to issue an order in 10 days. And that was on November 4th. So I believe --

JUDGE PROCTOR: That's judge time. That's like the last two minutes of the football game, it takes longer.

MR. WISNER: I anticipate getting the Order any time soon. I think having the *Saavedra* included in any centralization would be bizarre because it's a class action, it's consumer fraud cases and purely economic injuries.

Thank you.

JUDGE VANCE: Thank you.

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


--------------------------

Amy C. Diaz, RPR, CRR                December 7, 2014
S/ Amy Diaz